J-E03006-18

2019 PA Super 265

COMMONWEALTH OF PENNSYLVANIA : IN THE SUPERIOR COURT OF
                             :        PENNSYLVANIA
                             :
        v.                      :
                             :
                             :
RUSTY LEE BRENSINGER       :
                             :
          Appellant         :     No. 212 EDA 2017

Appeal from the PCRA Order December 23, 2016
In the Court of Common Pleas of Lehigh County
Criminal Division at No(s): CP-39-CR-0003251-1997

BEFORE: GANTMAN, P.J., BENDER, P.J.E., BOWES, J., PANELLA, J.,
        LAZARUS, J., OTT, J., STABILE, J., DUBOW, J., and MURRAY, J.

OPINION BY PANELLA, J.:               **FILED AUGUST 30, 2019**

Appellant, Rusty Lee Brensinger, appeals from the order of the Lehigh

County Court of Common Pleas denying his second petition under the Post

Conviction Relief Act ("PCRA"), 42 Pa.C.S.A. §§ 9541-9546, as untimely.

Brensinger argues that his facially untimely PCRA petition was entitled to

review under the newly discovered fact exception to the PCRA's time-bar, 42

Pa.C.S.A. § 9545(b)(1)(ii), due to the *pro se* prisoner exception set forth by

our Supreme Court in **Commonwealth v. Burton**, 158 A.3d 618 (Pa. 2017).

After our review of the parties' arguments, as well as the *amicus* brief filed in

support of Brensinger's position, we conclude that Brensinger is entitled to the

*pro se* prisoner exception under **Burton** because he was unrepresented from

2008 until 2015. However, because the PCRA court did not explicitly determine

when the relevant facts became part of the public record, we cannot determine

whether Brensinger's petition is entitled to review under the newly discovered facts exception. Accordingly, we are constrained to reverse and remand for a new hearing on the timeliness of Brensinger's petition.

On September 30, 1997, Brensinger was arrested and charged with the April 29, 1997 death of 16-month old Brittany Samuels. The case proceeded to a jury trial, wherein the following evidence was presented. Brittany's mother, Michelle Samuels, testified that on April 26, 1997, Brittany fell from a kitchen chair and hit her head on the floor. *See* Notes of Testimony ("N.T."), Jury Trial, 4/20/98, at 697-700. Two days later, Samuels and Brittany were staying at Brensinger's house, Samuel's then-boyfriend, when Samuels decided to take a shower. *See id*., at 745-746. Samuels placed Brittany in a portable crib in Brensinger's bedroom and proceeded downstairs to the bathroom. *See id*., at 740-741, 745-746. A few minutes into her shower, Brensinger began "banging on the door telling [her] to come out because there was something wrong with Brittany." *Id*., at 747.

Brensinger testified that he was watching television while Samuels was showering until he heard a thump come from his bedroom. *See* N.T., Jury Trial, 4/27/98, at 1804-1806, 1809. When he went to investigate, he discovered Brittany lying motionless on the bedroom floor next to the portable crib. *See id*., at 1810, 1816. After alerting Samuels, he began CPR on Brittany and instructed Samuels to call 911. *See id*., at 1812-1813.

Brittany was taken by ambulance to Lehigh Valley Hospital. *See id*., at 1818. The pediatrician on duty, Dr. Michael Barone, examined Brittany

approximately 15-20 minutes after her arrival and observed she had unequal pupils and retinal hemorrhaging. *See* N.T., Jury Trial, 4/17/98, at 429-430, 439, 441-442. Believing the severity of Brittany's injuries to be inconsistent with falls from the kitchen chair and the portable crib, Dr. Barone contacted Child Protective Services with his suspicion that her injuries were caused by another person. *See id*., at 455, 508-509. Brittany was transferred to the Children's Hospital of Philadelphia, and she ultimately died on April 29, 1997. *See id*., at 475-76.

At trial, the Commonwealth presented three experts who opined that Brittany's death was a result of "shaken baby syndrome."[1] *See* N.T., Jury Trial, 4/21/98, at 987; 4/22/98, at 1392, 1545-46. All of these experts argued that Brittany's death was very unlikely to have been caused by the two short falls Brittany had taken in the days before her death. *See* N.T., Jury Trial, 4/21/98, at 974; 4/22/98, at 1392; 1545-46. The defense did not present any expert testimony to rebut the experts' opinions about Brittany's cause of

---

[1] "Shaken baby syndrome," also known as "shaken-impact syndrome" or "abusive head trauma," refers to a series of brain injuries "that result from violent shaking of a small child whose weak neck muscles permit tremendous acceleration and deceleration movement of the brain within the skull." *Commonwealth v. Passarelli*, 789 A.2d 708, 715 (Pa. Super. 2001) *abrogated on other grounds by Commonwealth v. Spruill*, 80 A.3d 453 (Pa. 2013). The series of injuries commonly identified as markers of shaken baby syndrome include subdural hemorrhage, retinal hemorrhage, and brain dysfunction. *See* N.T., PCRA Hearing, 5/2/16, at 172 (Dr. Hua's description of the triad of symptoms once considered dispositive of a shaken baby syndrome diagnosis). "A diagnosis of 'shaken-impact syndrome' simply indicated that a child found with the type of injuries described above has not suffered those injuries by accidental means." *Passarelli*, 789 A.2d at 715.

death, but instead argued there was no proof Brensinger caused her death. Following the close of evidence, the jury convicted Brensinger of third-degree murder.

On May 29, 1998, the trial court sentenced Brensinger to 20 to 40 years' imprisonment. A panel of this Court upheld Brensinger's conviction, and our Supreme Court subsequently denied *allocatur* on May 30, 2000. **See Commonwealth v. Brensinger**, 3640 PHL 1998 (filed Dec. 1, 1998) (unpublished memorandum), *appeal denied* 1259 MAL 1999 (May 30, 2000). Brensinger did not seek review with the United States Supreme Court. Brensinger was represented throughout trial and the direct appeal by the same attorney, hereinafter referred to as "trial counsel."

In 2001, Brensinger filed his first counseled PCRA petition asserting various claims of ineffective assistance of trial counsel.[2] Following an evidentiary hearing, the PCRA court denied the petition, and a panel of this Court affirmed. **See Commonwealth v. Brensinger**, 989 EDA 2002 (Pa.

---

[2] Through his claims of ineffective assistance, Brensinger raised arguments related to the shaken baby syndrome diagnosis. **See** PCRA Petition, 7/18/01, at 2 ¶¶ 7-9. The PCRA precludes relief on issues that have been previously litigated. **See** 42 Pa.C.S.A. § 9543(a)(3). However, we do not consider an issue previously litigated for PCRA purposes if it relies upon different theories and allegations than the discrete legal ground already raised and decided. **See Commonwealth v. Collins**, 888 A.2d 564, 570 (Pa. 2005). Brensinger's initial claims related to trial counsel's failure to question the Commonwealth's medical expert about the *timing* of the shaking, not the validity of the conclusion that Brittany died from being shaken. **See id**. As Brensinger's prior claim involving shaken baby syndrome involved markedly different theories and allegations, we decline to find his issue previously litigated.

Super. filed May 13, 2003) (unpublished memorandum), *appeal denied*, 413 MAL 2003 (Nov. 13, 2003). Attorney Louis Natali represented Brensinger for the course of this PCRA petition. *See* Criminal Docket, CP-39-CR-0003251-1997, PCRA Petition filed by Attorney Natali, 7/18/01.

On September 28, 2004, Brensinger filed a federal *habeas corpus* petition in the United States District Court for the Eastern District of Pennsylvania. The district judge denied Brensinger's petition as untimely, and the United States Court of Appeals for the Third Circuit denied his certificate of appealability on February 13, 2007. Attorneys Louis Natali, Willie Pollins, and Norris Gelman represented Brensinger for the course of this federal petition. *See* Docket for the United States District Court for the Eastern District of Pennsylvania, 2:04-cv-04570-BWK, Withdrawal of Appearance by Attorneys Natali and Pollins, 8/26/05; Entry of Appearance by Attorney Gelman, 8/26/05.

After the denial of his *habeas corpus* petition, Brensinger, with the support of his family members, continued to seek relief. In 2008, Brensinger's stepfather, Anthony Tarantino, hired Attorney Burton Rose to review Brensinger's case. Attorney Rose advised "he didn't think there was anything he could do for [Brensinger]." N.T., PCRA Hearing, 7/15/16, at 12, 14, 30.

In 2009, Brensinger heard "gossip" in prison that there were developments relating to shaken baby syndrome. *See* N.T., PCRA Hearing, 7/15/16, at 44. Tarantino contacted Attorney Mark Freeman who agreed to

review Brensinger's case. **See id**., at 12. Subsequently, in 2011, Brensinger contacted the Pennsylvania Innocence Project ("PIP").

PIP did not immediately agree to represent Brensinger, but agreed to review his case. **See id**., at 33. In 2015, after obtaining Brittany's medical records and hiring experts to review these records, Attorney Freeman and PIP agreed to represent Brensinger. **See id**., at 34. **See** Criminal Docket, CP-39-CR-0003251-1997, Entries of Appearance for Attorney Freeman, Nilam Ajit Sanghvi, Esq., Howard D. Scher, Esq., and John James Powell, Esq., 4/24/15.

In early April of 2015, Brensinger received reports from three medical experts who concluded that any scientific evidence linking Brittany's death to shaken baby syndrome was invalid. Based upon these reports, Brensinger filed his second PCRA petition on April 24, 2015.[3] Through his filing, Brensinger specifically recognized that the petition was facially untimely, but asserted his claim met the newly discovered fact exception, 42 Pa.C.S.A. § 9545(b)(1)(ii), to the PCRA's time-bar and therefore met the criteria for a hearing on the merits.[4]

_____

[3] Brensinger amended his petition on September 11, 2015 after receiving an additional expert opinion from Dr. Chris Van Ee, a biomedical engineer. **See** Amended PCRA petition, 9/11/15 at ¶ 15 (expert concluding he could not rule out short falls as the cause of Brittany's death).

[4] Appellant's petition was filed by "his newly-retained pro bono attorneys, Nilam A. Sanghvi, Mark D. Freeman, Howard D. Scher, and John J. Powell." PCRA Petition, 4/24/15, at 1. Sanghvi is an attorney with PIP in Philadelphia; Freeman is an attorney with an office in Media; and Scher and Powell are

The PCRA court held hearings centered around this timeliness exception on May 2, 2016 and July 15, 2016. Brensinger presented testimony from his four experts[5] regarding the scientific developments surrounding shaken baby syndrome since Brittany's death in 1997, as well as fact witnesses who testified about Brensinger's diligence in obtaining representation and these expert opinions.

Ultimately, the court determined Brensinger failed to overcome the PCRA's time-bar. **See** PCRA Court Opinion, 12/23/16, at 7. The court found that while the expert opinions were new, the science behind the opinions was part of the public record well before 2015. **See id**., at 5-7. Further, the PCRA court concluded that because Brensinger had been represented since at least 2009, scientific developments relating to shaken baby syndrome could not be deemed unknown to him for the purposes of meeting the newly discovered fact exception to the PCRA's time-bar. **See id**. Therefore, because Brensinger did not prove the timeliness exception, the PCRA court denied his second petition as untimely on December 23, 2016.

On appeal, Brensinger presented four issues for consideration:

1. Whether the PCRA court erred in determining that it did not have jurisdiction over [] Brensinger's PCRA petition?

_____

attorneys with Buchanan, Ingersoll & Rooney PC in Philadelphia. All counsel represent Brensinger in the instant appeal as well.

[5] At the hearing, the PCRA Court certified Dr. Chris Van Ee as an expert in biomechanics, Dr. Julie Mack as an expert in pediatric radiology, Dr. Zhongxue Hua as an expert in forensic pathology, and Dr. John Galaznik as an expert in pediatrics. **See** N.T., PCRA Hearing, 5/2/16, at 71, 115, 167, 205.

2. Whether jurisdiction exists because the PCRA's timing provisions are unconstitutionally void-for-vagueness in the context of claims like [] Brensinger's that are predicated upon expert opinions applying evolving scientific principles to the facts of the case?

3. Whether **Commonwealth v. Peterkin**, 722 A.2d 638 (Pa. 1998), was wrongly decided?

4. Whether **Commonwealth v. Edmiston**, 65 A.3d 339 (Pa. 2013), was wrongly decided?

Appellant's Opening Brief, at 6.

A divided panel of this Court affirmed the trial court order denying relief. However, on May 15, 2018, this Court granted Brensinger's petition for reargument *en banc* to address whether Brensinger was entitled to the *pro se* prisoner exception pursuant to **Commonwealth v. Burton**, 158 A.3d 618 (Pa. 2017).

Our standard of review is well settled. "When reviewing the denial of a PCRA petition, we must determine whether the PCRA court's order is supported by the record and free of legal error." **Commonwealth v. Smith**, 181 A.3d 1168, 1174 (Pa. Super. 2018) (citation omitted). While we are generally bound by a PCRA court's credibility determinations, we apply a *de novo* standard to our review of the court's legal conclusions. **See id**.

All PCRA petitions "including a second or subsequent petition, shall be filed within one year of the date the judgment [of sentence] becomes final" unless an exception applies. 42 Pa.C.S.A. § 9545(b)(1). The PCRA's time limitations are jurisdictional in nature and, as such, may not be altered or

disregarded in order to address the merits of a petition. ***See Commonwealth v. Bennett***, 930 A.2d 1264, 1267 (Pa. 2007). As the timeliness of a petition is separate from the merits of Brensinger's underlying claim, we must first determine whether the PCRA petition is timely filed. ***See Commonwealth v. Stokes***, 959 A.2d 306, 310 (Pa. 2008).

Brensinger does not dispute that his petition, filed almost fifteen years after his judgment of sentence became final, is facially untimely.[6] ***See*** Appellant's Opening Brief, at 7. However, Brensinger asserts his claim merits review because he pled, and proved, an exception to the PCRA's one-year time-bar in his PCRA petition. These exceptions provide:

> **(b) Time for filing petition**. --
>
> (1) any petition under this subchapter, including a second or subsequent petition, shall be filed within one year of the date the judgment becomes final, unless the petition alleges and the petitioner proves that:
>
>> (i) the failure to raise the claim previously was the result of interference by government officials with the presentation of the claim in violation of the Constitution or laws of this Commonwealth or the Constitution or law of the United States;

---

[6] All parties agree that Brensinger's judgment of sentence became final on August 28, 2000, 90 days after our Supreme Court denied allowance of appeal. ***See*** 42 Pa.C.S.A. § 9545(b)(3)("[A] judgment [of sentence] becomes final at the conclusion of direct review, including discretionary review in the Supreme Court of the United States and the Supreme Court of Pennsylvania, or at the expiration of time for seeking the review."); ***see also*** U.S.Sup.Ct.R.13 (petition for writ of *certiorari* must be filed within 90 days).

(ii) the facts upon which the claim is predicated were unknown to the petitioner and could not have been ascertained by the exercise of due diligence; or

(iii) the right asserted is a constitutional right that was recognized by the Supreme Court of the United States or the Supreme Court of Pennsylvania after the time period provided in this section and has been held by that court to apply retroactively.

42 Pa.C.S.A. § 9545(b)(1)(i)-(iii). If an exception applies, a PCRA petition will be considered if it is "filed within 60 days of the date the claim could have been presented." 42 Pa.C.S.A. § 9545(b)(2).[7]

Brensinger asserts he meets the requirements of 42 Pa.C.S.A. § 9545(b)(1)(ii), *i.e.*, the newly discovered fact exception to the PCRA's time-bar. Specifically, Brensinger contends the expert opinions concerning Brittany's cause of death constitute newly discovered facts for the purposes of section 9545(b)(1)(ii). Moreover, because Brensinger filed his petition within 60 days of the date his experts proffered their opinions, Brensinger asserts it was error for the trial court to conclude he did not meet the newly discovered fact exception.

---

[7] On October 24, 2018, the General Assembly amended section 9545(b)(2) of the PCRA statute to expand the time for filing a petition from 60 days to one year from the date the claim could have been presented. *See* 2018 Pa.Legis.Serv.Act 2018-146(S.B. 915), effective December 24, 2018. The amendment applies only to claims arising one year before the effective date of this section, *i.e.* December 24, 2017, or thereafter. Instantly, Brensinger's petition was filed in 2015. Therefore, the amendment is inapplicable to Brensinger's claim.

The newly discovered fact exception "has two components, which must be alleged and proved. The petitioner must establish that: 1) the facts upon which the claim was predicated were unknown and 2) could not have been ascertained by the exercise of due diligence. **See Bennett**, 930 A.2d at 1272 (Pa. 2007). Due diligence requires the petitioner "take reasonable steps to protect his own interests." **Commonwealth v. Monaco**, 996 A.2d 1076, 1080 (Pa. Super. 2010) (citations omitted).

However, it does not require "perfect vigilance nor punctilious care, but rather it requires reasonable efforts by a petitioner, based on the particular circumstances to uncover facts that may support a claim for collateral relief." **Commonwealth v. Shiloh**, 170 A.3d 553, 558 (Pa. Super. 2017) (citation omitted). As such, "the due diligence inquiry is fact-sensitive and dependent upon the circumstances presented." **Id**. (citation omitted). "A petitioner must explain why he could not have obtained the new fact(s) earlier with the exercise of due diligence." **Monaco**, 996 A.2d at 1080.

In most cases, petitioners cannot claim that information of public record is unknown in order to establish the first prong of the test. **See Commonwealth v. Chester**, 895 A.2d 520, 523 (Pa. 2006). However, our Supreme Court recently determined that the public record presumption does not apply to *pro se* prisoners. **See Burton**, 158 A.3d at 638 (Pa. 2017), ("[T]he application of the public record presumption to *pro se* prisoners is contrary to the plain language of subsection 9545(b)(1)(ii) and was imposed

without any apparent consideration of a *pro se* prisoner's actual access to information of public record"). The Court clarified that "[a] *pro se* incarcerated petitioner is still required to prove that the facts upon which his claim of a timeliness exception under subsection 9545(b)(1)(ii) is based were **unknown to him** and not ascertainable by the exercise of due diligence. Our decision merely eliminates what we conclude is an unjustifiable presumption." ***Id***., at 638 n. 23 (emphasis in original).

> Accordingly, consistent with the statutory language, in determining whether a petitioner qualifies for the exception to the PCRA's time requirements pursuant to subsection 9545(b)(1)(ii), the PCRA court must first determine whether the facts upon which the claim is predicated were unknown to the petitioner. In some cases, this may require a hearing. After the PCRA court makes a determination as to the petitioner's knowledge, it should then proceed to consider whether, if the facts were unknown to the petitioner, the facts could have been ascertained by the exercise of due diligence, including an assessment of the petitioner's access to public records.

***Id***., at 638 (internal quotation marks and footnote omitted).[8]

_____

[8] While the controlling case law currently mandates the application of the public record presumption in cases where a PCRA petitioner is represented by counsel, we note that the presumption's days appear to be numbered.

The majority opinion in ***Burton*** narrowly defined the issue before it as whether it should apply the presumption to incarcerated *pro se* petitioners. ***See*** 158 A.3d at 635 n.20. Nevertheless, it began its discussion of the issue by observing the presumption was created in a decision that cited no authority for it. ***See id***., at 633. Furthermore, the presumption has no connection to the statutory language of Section 9545(b)(1)(ii). ***See id***. In recognizing the incarcerated, *pro se* petitioner exception, the majority concluded "however reasonable the public record presumption may be with regard to PCRA petitioners generally, the presumption cannot reasonably be applied to *pro se*

The PCRA court, in rejecting Brensinger's proffer of the newly discovered fact exception, stated:

> … I find [Brensinger] has failed to establish that he could not have discovered these "unknown facts" by the exercise of due diligence. [Brensinger] claims the expert opinions themselves are the new facts supporting his claim. However, it is the underlying scientific principles supporting these opinions that are the "facts" for the purposes of Section 9545(b)(1)(ii). ***Commonwealth v. Edmi[]ston***, 65 A.3d [339,] 352 [(Pa. 2013)]. [Brensinger] emphasizes that his experts' opinions must be considered the unknown facts because it was the first time new scientific principles were applied specifically to the facts of this case.[] Unfortunately, those scientific principles were in the public domain before February 2015, and [Brensinger] does not offer a reasonable explanation as to why he could not have secured experts sooner to apply those principles to the facts of his case.
>
> "[D]ue diligence requires neither perfect vigilance nor punctilious care, but rather it requires reasonable efforts by a petitioner, *based on the particular circumstances* to uncover facts that may support a claim for collateral relief." ***Commonwealth v. Burton***, 121 A.3d 1063, 1071 (Pa. Super. 2015), *appeal granted*, 158 A.3d 618 (Pa. 2016) (emphasis added). While is it true that [Brensinger] has been incarcerated since his conviction and his family has limited resources, he has been represented by counsel

---

PCRA petitioners who are incarcerated." ***Id***., at 635 (emphasis added). As a result, the majority opinion can be read as criticizing the presumption without reaching the issue of its validity.

Similarly, the dissent acknowledged, "the presumption may be in tension with the statutory language which governs the newly-discovered-facts exception." ***Id***., at 640 (Baer, J., dissenting). "Perhaps this Court should examine the whole of this presumption at some point in a future case when the issue is before us[.]" ***Id***. Furthermore, the dissent opined, "it may be advisable for this Court to abandon what the [m]ajority has articulated as the public record presumption, in favor of an evidence[]-based criteria which reflects the plain language of the newly-discovered-facts exception." ***Id***., at 643 n.6 (citation omitted). Consequently, the dissent posits that the continuing validity of the presumption is an open question.

since at least 2009, and has had the Pennsylvania Innocence Project working on his case since 2011. When a petitioner is represented by counsel, public records should be presumptively knowable. **Commonwealth v. Burton**, 121 A.3d 1063, 1071 (Pa. Super. 2015), appeal granted, 158 A.3d 618 (Pa. 2016).

The reports offered by [Brensinger] cite to studies and research published from 2004 to 2012. More notably, [Brensinger's] own experts from the PCRA hearing indicated the turning point in scientific research in the area of shaken baby syndrome began to occur as early as 2001. Finally, there is some question as to whether the studies and research relied on by [Brensinger] actually presents "new science." Accordingly, the information relied on by [Brensinger] could have been discovered with the exercise of due diligence prior to the filing of [Brensinger's] petition in 2015. Similarly, [Brensinger] has failed to prove that he filed his petition within 60 days of when it first could have been raised.

[Brensinger] has failed to meet his burden of proving an exception to the PCRA's time limit, and this court is without jurisdiction to hear the merits of the petition.

PCRA Court Opinion, 12/23/16, at 5-7.

Notably, in reaching this conclusion, the PCRA court determined Brensinger was subject to the public records presumption because he was represented by Attorney Freeman since at least 2009 and by PIP since 2011. However, our review of this matter reveals that this finding is unsupported by evidence of record.

In many situations, determining if a criminal defendant is represented by counsel can be resolved by referring to the docket sheet. Pennsylvania law requires counsel to "file an entry of appearance with the clerk of courts promptly after being retained, and serve a copy of the entry of appearance on the attorney for the Commonwealth." Pa.R.Crim.P. 120(A)(1); **see also**

Pa.R.Crim.P. 904(A) (requiring attorney retained in post-conviction proceedings to promptly file a written entry of appearance). Once counsel enters his appearance, he "is responsible to diligently and competently represent the client until his or her appearance is withdrawn." **Commonwealth v. Librizzi**, 810 A.2d 692, 693 (Pa. Super. 2002) (citing Pa.R.P.C. 1.1 (Competence) and 1.3 (Diligence)). Counsel may not withdraw his representation until granted leave by the court. **See** Pa.R.Crim.P. 120(B)(1).

Neither Attorney Freeman nor PIP entered their appearance on behalf of Brensinger before April 24, 2015. This, then, is *prima facie* evidence that neither Attorney Freeman nor PIP represented Brensinger before that date.

This *prima facie* evidence can only be overcome by the presentation of some evidence that an attorney-client relationship existed before that date. An attorney-client relationship can arise through either an express or an implied agreement. **See Atkinson v. Haug,** 622 A.2d 983, 986 (Pa. Super. 1993) (citation omitted).

> Absent an express contract, an implied attorney/client relationship will be found if[:] 1) the purported client sought advice or assistance from the attorney; 2) the advice sought was within the attorney's professional competence; 3) the attorney expressly or impliedly agreed to render such assistance; and 4) it is reasonable for the putative client to believe the attorney was representing him.

**Cost v. Cost**, 677 A.2d 1250, 1254 (Pa. Super. 1996) (citation omitted).

Furthermore, while our Rules of Criminal Procedure require counsel to promptly file an entry of appearance after officially being retained, our Rules of Professional Conduct recognize that there is often a lapse between the time when a client initially contacts an attorney and when representation officially commences. During this time period, the client is a "prospective client." **See** Pa.R.P.C. 1.18(a).  "Prospective clients, like clients, may disclose information to a lawyer, place documents or other property in the lawyer's custody, or rely on the lawyer's advice." **Id**., at cmt. 1. However, prospective clients do not receive all of the protection afforded clients, and the attorney is not required to undertake representation following review of the case. **See id**., at cmt. 1, 4.

Here, while it is clear that Brensinger sought advice from both Attorney Freeman and PIP and the advice sought was within their professional competence, there is no evidence that either Attorney Freeman or PIP expressly or impliedly agreed to render assistance until 2015. Further, there is no evidence that Brensinger reasonably believed that Attorney Freeman or PIP represented him until they filed their entries of appearance.

At the PCRA hearing, Attorney Freeman testified he represents Brensinger for the current petition. **See** N.T., PCRA Hearing, 5/2/16, at 26. During cross-examination, the Commonwealth asked if he had agreed to take the case in 2009. He answered, "No." **Id**., at 30. The Commonwealth then asked if PIP "became involved" in 2011. Attorney Freeman responded, "I really

don't remember." *Id*., at 31. Thus, from Attorney Freeman's testimony, the record is clear that Attorney Freeman did not represent Brensinger in 2009.

Marissa Bluestine, Esquire, testified she is the legal director for PIP and confirmed PIP also represents Brensinger for the current petition. *See id*., at 33. After Brensinger contacted PIP, she confirmed that PIP attempted to obtain Brittany Samuels's medical record for review in 2011. *See id*., at 34. "When we first started looking at Mr. Brensinger's case, we knew that a key to really *deciding whether or not we could even get involved* would be looking at the medical records themselves because that was such a key part of the conviction." *Id*., at 35 (emphasis supplied). Therefore, in 2011, PIP was still determining whether it would get involved with Brensinger's case. The record cannot support a finding that PIP actually represented Brensinger in 2011.

Hoping to bolster the chances of receiving the necessary records to determine if it would represent Brensinger, PIP narrowed its request to brain and tissue slides. *See id*., at 38-39. As of the date of the PCRA hearing, PIP had never successfully obtained the requested records. *See id*., at 41-42. Attorney Bluestine testified she delayed obtaining expert reports until she could present a full medical record to the experts. *See id*., at 47. However, in 2015, cognizant of a potential timeliness issue, Attorney Bluestine prudently

submitted the medical records she had received to experts for review.[9] Attorneys for the PIP officially entered their appearance on behalf of Brensinger once they received the expert reports and submitted them to the trial court as part of a PCRA petition. As a result, the record is also clear that PIP had not agreed to represent Brensinger until 2015 at the earliest.

The most explicit evidence on the issue of representation came from Brensinger. He testified PIP's initial review of the case was a "long process," that involved multiple months' long stages. *See* N.T., PCRA Hearing, 7/15/16, at 33. PIP did not agree to represent him until 2015. *See id*., at 34. This constitutes the only evidence of record regarding when Attorney Freeman and PIP agreed to represent Brensinger as attorneys-at-law. Therefore, the record is also clear that Brensinger did not believe, reasonably or otherwise, that he was represented until 2015.

Arrayed against this testimony is the PCRA court's finding that Brensinger was represented by Attorney Freeman in 2009, and by PIP since 2011. In support of this finding, the PCRA court references, but does not cite to, the testimony of Brensinger's step-father, Anthony Tarantino. After reviewing the totality of Tarantino's short testimony, we find no testimony

---

[9] Our review of the record reveals that Attorney Bluestine expertly balanced Brensinger's need to diligently pursue his claim under the PCRA with her duty to not assert frivolous claims under Pa.R.P.C. 3.1.

that supports this finding. The only arguable support comes during the Commonwealth's cross-examination:

Q: And you retained [Attorney] Freeman in 2009?

A: He reviewed the case for the first time in 2009, yes.

N.T. PCRA Hearing, 7/15/16, at 15. Placed in the context of Attorney Freeman's and Brensinger's testimony, this statement only confirms that Attorney Freeman agreed to look at this case in 2009. It cannot establish that he had agreed to represent Brensinger at that time.

It is clear from all the testimony that Brensinger was at most a prospective client, as defined in Pa.R.P.C. 1.18(a), of both Attorney Freeman and PIP until 2015. Prior to that time, there is no indication that either Attorney Freeman or PIP expressly or impliedly agreed to render professional legal assistance to Brensinger or that it would have been reasonable for Brensinger to believe either PIP or Attorney Freeman was representing him. Therefore, because Brensinger was unrepresented from at least 2009 to 2015, we conclude he was not subject to the public records presumption during that time period, but instead was entitled to the benefit of the *pro se* prisoner exception pursuant to **Burton**.

However, while we conclude Brensinger was entitled to this exception from 2009 to 2015 because he was unrepresented, our review of the docket reveals Brensinger was represented by counsel from 1997 until the denial of his *habeas corpus* petition in federal court in 2007. **See** Criminal Docket, CP-

39-CR-0003251-1997, Praecipe for Appearance by Attorney Collins, 11/20/97, PCRA Petition filed by Attorney Natali, 7/18/01; Docket for the United States District Court for the Eastern District of Pennsylvania, 2:04-cv-04570-BWK, Withdrawal of Appearance by Attorneys Natali and Pollins, 8/26/05; Entry of Appearance by Attorney Gelman, 8/26/05; *see also* Appellant's Supplemental Brief, at 17-18 (admitting Brensinger engaged legal counsel on direct appeal, in his first PCRA petition, and in his federal habeas petition). Additionally, both Brensinger and his step-father testified that they expressly hired Attorney Rose to review his case in 2008. *See* N.T., PCRA Hearing, 7/15/16, at 12, 14, 30 (identifying Attorney Rose as the last private attorney they retained). Pursuant to our interpretation of **Burton**, a petitioner must be unrepresented at the time the underlying facts in his petition enter the public record in order to benefit from the *pro se* prisoner exception to the public record presumption.[10] Therefore, if the newly discovered facts in

_____

[10] In footnote to the Minority's dissent in **Burton**, Justice Baer questions when a petitioner benefits from the newly outlined exception to the public record presumption.

> It is unclear to me from the Majority Opinion at what stage an incarcerated PCRA petitioner must be pro se to qualify for the exception to the public record presumption. For example, to benefit from this exception, does the incarcerated petitioner have to be pro se when the "unknown fact" occurred, when it became publicly accessible, or when he files his PCRA petition?... In this case, we have no idea when exactly [Burton] had or did not have counsel.

Brensinger's petition entered the public record between 1997 and 2008, the time period in which Brensinger admits he was represented, his petition is subject to the public records presumption, and his attempt to prove an exception to the PCRA's time-bar fails. **See Commonwealth v. Chester**, 895 A.2d 520, 523 (Pa. 2006).[11]

Brensinger contends the "newly discovered facts" underlying his petition were the expert opinions themselves. **See** Appellant's Supplemental Brief, at 3. In making this assertion, Brensinger relies upon our Supreme Court's recent decision in **Commonwealth v. Chmiel**, 173 A.3d 617 (Pa. 2017),[12] for the proposition that "there is a qualitative difference between *suspecting* the forensic science used at trial may have been unreliable and *actually knowing* that it was." Appellant's Supplemental Brief, at 10 (emphasis in original). Therefore, Brensinger urges us to find that for purposes of proving the newly discovered fact exception, the 60-day filing deadline is triggered by the

_____

**Burton**, 158 A.3d at 639 n.3 (Baer, J. dissenting). In the absence of clear precedent on this issue, we conclude that the operative time in this analysis is when the relevant fact became publicly accessible.

[11] Through his appellate brief, Brensinger also argues that he is not subject to the public records presumption because the scientific principles that his expert relied on to compile their expert reports have never been in the public domain. **See** Appellant's Opening Brief, at 43-47. However, as we ultimately remand this case for a determination of which scientific principles constitute the crux of Brensinger's petition and when these principles entered into the public domain, this issue is not ripe for our review.

[12] **Chmiel** was decided by the Pennsylvania Supreme Court almost a year after the PCRA court issued its opinion in this matter.

*application* of the new scientific principles to an appellant's case, rather than the mere discovery of the scientific principles. ***See id***., at 9–15. Despite the compelling logic of this argument, neither ***Chmiel*** or any other existing case law permits us to interpret "newly discovered facts" in this manner.

Our Supreme Court in ***Edmiston***, 65 A.3d 339, specifically addressed the meaning of "facts" within the context of the "newly discovered facts" exception to the PCRA's time-bar. In ***Edmiston***, the defendant argued that a National Academy of Sciences report concerning the imprecision of microscopic hair analysis constituted his "newly discovered fact" for the purposes of this exception. As Edmiston filed his petition within 60 days of the publication of this report, he asserted he proved this exception to the PCRA's time-bar. However, the Court found Edmiston was unable to prove this exception because the scientific principles on which the report relied had been in the public domain for years prior to the publication of the report. ***See id***., at 352. In reaching this conclusion, the Court held that:

> to constitute such "facts," the information may not be part of the public record. Similarly, we have held that a petitioner must allege and prove previously unknown "facts," not merely a "newly discovered or newly willing source for previously known facts." These principles have been applied when a petitioner has relied on a study to satisfy the time-bar exception of Section 9545(b)(1)(ii). ***See*** [***Commonwealth v.***] ***Lark***, [] 846 A.2d [585,] 588 n.4 [(Pa. 2000)] (concluding that because a particular study of the Philadelphia criminal justice system consisted of statistics which were of public record, it could not be said that the statistics were known to the petitioner).

***Id***. at 352 (some citations omitted).

A few years later, in **Chmiel**, the Supreme Court was confronted with another case involving the inaccuracy of microscopic hair analysis. Chmiel argued he met the newly discovered evidence exception to the PCRA's time-bar because he filed his PCRA petition within 60 days of an FBI press release and a *Washington Post* article about the inaccuracy of this type of science. **See Chmiel**, 173 A.3d at 621. The PCRA court, analogizing Chmiel's case to **Edmiston**, determined that the FBI press release merely referred to facts that had been within the public domain since 1974 and as such, could not be considered new evidence for the purposes of meeting the exception. **See id**., at 623. The Supreme Court reversed the PCRA court's decision, finding the PCRA court's reliance on **Edmiston** misplaced. Instead, they found Chmiel's petition relied upon two facts in the FBI Press Release that were not previously part of the public domain - the FBI's public admission that testimony provided by its analysts relating to microscopic hair comparison analysis was largely erroneous and its admission that it trained many state and local analysts with the same scientifically flawed techniques. **See id**., at 625. Despite Brensinger's contention, this holding does not alter **Edmiston**'s proclamation ruling that a petitioner cannot rely on newly willing sources, including expert

opinions, for previously known scientific principles in order to satisfy the 60-day filing requirement.[13]

Here, the PCRA court determined that "it is the underlying scientific principles supporting [Brensinger's expert opinions] that are the 'facts' for purposes of Section 9545(b)(1)(ii)." PCRA Opinion, 12/23/16, at 5 (quoting **Edmiston**, 65 A.3d at 352). However, as highlighted in **Chmiel**, this statement only holds true if the scientific principles supporting Brensinger's expert opinions had existed in the public domain prior to their inclusion in Brensinger's expert reports.

In denying Brensinger PCRA relief, the PCRA court neglected to analyze which scientific principles constitute the "facts" for the purposes of Section 9545(b)(1)(ii). Furthermore, it failed to determine if these "facts" existed in the public domain prior to the experts' use of the principles in forming their opinions, and, if so, *when* these principles entered into the public domain.

Each of Brensinger's four experts relied upon multiple scientific principles from various studies, papers and statements published between 1934 and 2013 to form their expert opinion. **See** N.T., PCRA Hearing, 5/2/16, at 73–82 (Dr. Chris Van Eee briefly describing the principles derived from five

---

[13] In fact, the Court in **Chmiel** reaffirmed this statement. **See** 173 A.3d at 625 ("As this Court explained in **Edmiston**, to fall within this exception, the factual predicate of the claim 'must not be of public record and must not be facts that were previously known but are now presented through a newly discovered source"). Our review of **Chmiel** leads us to conclude that **Chmiel** distinguished **Edmiston**, but did not overrule it.

scientific studies, published between 2001 and 2009, that he utilized to reach his expert opinion), 118-141 (Dr. Julie Mack describing the evolution of five scientific principles, which she learned about between 2007 and 2013, that changed her view on shaken baby syndrome diagnoses), 173–182 (Dr. Zhongxue Hua testifying to two scientific developments between 2001 and 2011 that changed the way he looked at brain injuries), 207–237 (Dr. John C. Galaznik testifying as to the changes in the American Academy of Pediatrics' view on shaken baby syndrome between 2001 and 2009 and to scientific discoveries from studies performed in 2010 and 2012); *see also* Defendant's Exhibit 1B, PCRA Hearing, 5/2/16 (report of Dr. Galanznik, expert in the field of pediatrics, referencing 11 scientific articles relied upon in reaching his expert opinion); Defendant's Exhibit 2, PCRA Hearing, 5/2/16 (report of Dr. Hua, expert in the field of forensic pathology, referencing articles published in 2011 and 2012 in support of his expert opinion); Defendant's Exhibit 3, PCRA Hearing, 5/2/16 (report of Dr. Mack, expert in the field of pediatric radiology, referencing articles and studies spanning from 1934 to 2013 which contain a total of 10 scientific principles she relied upon in reaching her conclusion); Defendant's Exhibit D-2, PCRA Hearing, 5/2/16 (report of Dr. Chris Van Ee, expert in the field of biomedical engineering, that relied upon 23 articles and scientific studies published between 1984 and 2012 to reach expert opinion).

Resolution of these questions requires further fact-finding. The PCRA court, sitting as fact-finder, is the proper forum to resolve these questions and

to ultimately determine whether Brensinger met the proof requirement under Section 9545(b)(1)(ii). **See Commonwealth v. Bennett**, 930 A.2d 1264, (Pa. 2007) (remanding to PCRA court to resolve question of due diligence); **see also Commonwealth v. Burton**, 158 A.3d 618, 633-34 (Pa. 2017). Therefore, we remand this matter for an evidentiary hearing.

In his second issue on appeal, Brensinger argues that jurisdiction exists because the PCRA's timing provisions, as applied to claims based on evolving scientific principles, are unconstitutionally void-for-vagueness.[14] **See**

_____

[14] While not in the context of a "void-for-vagueness" constitutional analysis, our Supreme Court has ruled the PCRA's time-bar exceptions are constitutional. **See Commonwealth v. Peterkin**, 722 A.2d 638, 642-643 (Pa. 1998). In coming to this conclusion, the Court noted:

> [b]ecause the one-year period within which petitions normally must be filed is sufficiently generous to prepare even the most difficult case, and because the exceptions to this filing period encompass government misconduct, after-discovered evidence, and constitutional changes, we have no difficulty in concluding that the PCRA's time limitation upon the filing of PCRA petitions does not unreasonably or unconstitutionally limit Peterkin's constitutional right to habeas corpus relief. At some point litigation must come to an end. The purpose of the law is not to provide convicted criminals with the means to escape well-deserved sanctions, but to provide a reasonable opportunity for those who have been wrongly convicted to demonstrate the injustice of their conviction. The current PCRA places time limitations on such claims of error, and in so doing, strikes a reasonable balance between society's need for finality in criminal cases and the convicted person's need to demonstrate that there has been an error in the proceeding that resulted in his conviction.

**Id**.

Appellant's Opening Brief, at 6, 59-60. "As a threshold matter, a statute is presumed to be constitutional and will only be invalidated as unconstitutional if it clearly, palpably, and plainly violates constitutional rights." **Commonwealth v. Ludwig**, 874 A.2d 623, 628 (Pa. 2005) (citation and internal quotation marks omitted). Analysis of the constitutionality of a statute is a question of law; therefore, our standard of review is *de novo*, and our scope of review is plenary. **See id**., at 628 n. 5.

Our Supreme Court has stated the concept of unconstitutional vagueness arises from due process concerns. **See Commonwealth v. Herman**, 161 A.3d 194, 204 (Pa. 2017). The void-for-vagueness doctrine, as it is known, provides that "[a] statute may be deemed to be unconstitutionally vague if it fails in its definiteness or adequacy of statutory expression." **Ludwig**, 874 A.2d at 628. However, under the void-for-vagueness standard, a statute will only be found unconstitutional "if the statute is so vague that persons of common intelligence must necessarily guess at its meaning and differ as to its application." **Commonwealth v. McCoy**, 69 A.3d 658, 662 (Pa. Super. 2013) (citation and internal quotation marks omitted).

"Vagueness challenges to statutes which do not involve First Amendment freedoms must be examined in light of the facts of the case at hand." **Commonwealth v. Kakhankham**, 132 A.3d 986, 990 (Pa. Super. 2015) (citation omitted). Therefore, we will address the alleged vagueness of the statutory provision as it applies to this case.

Instantly, Brensinger contends the timing provisions are vague when applied to petitions such as his, where the PCRA challenge is based upon science that has evolved since the time of trial. *See* Appellant's Opening Brief, at 59. However, Brensinger bases the bulk of his vagueness argument upon the PCRA court's failure to identify the scientific principles underlying his petition that would trigger his obligation to file a petition. *See id*., at 60 ("These vague statements highlight that it would not be clear to a person of ordinary intelligence what even would trigger the obligation to file a petition within 60 days").  As noted above, we conclude the PCRA court erred in failing to identify the specific scientific principles that triggered Brensinger's filing obligation and remand for an evidentiary hearing. Thus, Brensinger's void-for-vagueness argument is not ripe for review.

In his final two issues on appeal, Brensinger asks whether our Supreme Court wrongly decided *Commonwealth v. Peterkin*, 722 A.2d 638 (Pa. 1998), and *Commonwealth v. Edmiston*, 65 A.3d 339 (Pa. 2013). *See* Appellant's Opening Brief, at 6 ¶¶ 3-4. Brensinger contends the Supreme Court erred in *Peterkin* by holding that the PCRA's timing requirements are jurisdictional in contravention of the statute's legislative history and its plain language. *See* 722 A.2d at 641; Appellant's Opening Brief, at 61-62. Additionally, Brensinger attacks the Supreme Court's use of the public record presumption to bar relief in *Edmiston* as he contends the presumption itself is highly flawed. *See* 65 A.3d at 352; Appellant's Opening Brief, at 62.

However, this Court has no authority to overrule either of these cases*.* As an intermediate appellate court, we "generally lack[] the authority to determine that [the Supreme] Court's decisions are no longer controlling." ***Walnut Street Associates, Inc. v. Brokerage Concepts, Inc***., 20 A.3d 468, 480 (Pa. 2011) (citing ***Commonwealth v. Jones***, 554 A.2d 50, 51-51 (Pa. 1989)). Instead, we "are duty-bound to effectuate [the Supreme] Court's decisional law." ***Id***. Therefore, we note that Brensinger has preserved these issues by raising them in this Court, but that we have no power to grant relief.[15]

Based upon the foregoing, we vacate the PCRA court's order dismissing Brensinger's petition and remand this matter to the PCRA court for an evidentiary hearing to determine which scientific principles constitute the facts upon which Brensinger's petition was based and if, or when, these facts entered the public domain. In determining when these principles entered the public domain, the PCRA court's focus should be on the date this information became publically available to Brensinger and his experts.

If the PCRA properly concludes this information was publically available prior to 2009, the public record presumption applies, and Brensinger cannot prove that these facts were unknown to him for purposes of meeting the

---

[15] Brensinger acknowledged in his brief that he raised issues three and four solely "to preserve them for any further appeal to the Pennsylvania Supreme Court." Appellant's Opening Brief, at 6.

newly-discovered evidence exception to the PCRA's time-bar. **See Chester**, 895 A.2d at 523. Alternatively, if the PCRA court determines this information entered the public record after 2009, Brensinger is entitled to the benefit of the *pro se* prisoner exception to the public record presumption. **Commonwealth v. Burton**, 158 A.3d 618, 638 (Pa. 2017). This finding does not automatically entitle Brensinger to relief, as he must still prove that "that the facts upon which his claim of a timeliness exception under subsection 9545(b)(1)(ii) is based were **unknown to him** and not ascertainable by the exercise of due diligence." **Id**., at 638 n. 23 (emphasis in original).

Order vacated. Case remanded with instructions. Jurisdiction relinquished.

Judges Lazarus, Ott, Stabile, Dubow, and Murray join the opinion.

Judge Bowes files a dissenting opinion in which President Judge Gantman and President Judge Emeritus Bender join.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 8/30/19